See also D.C., 268 F.Supp. 965.

**GOLDLAWR, INCORPORATED**

v.

**Jacob J. SHUBERT et al.**

**Civ. A. Nos. 21506, 22092.**

United States District Court
E. D. Pennsylvania.

Sept. 20, 1968.

Blank, Rudenko, Klaus & Rome, Edwin P. Rome, Morris L. Weisberg, Philadelphia, Pa., for plaintiff.

Montgomery, McCracken, Walker & Rhoads, Charles A. Wolfe, Hugh G. Moulton, Philadelphia, Pa., for defendants.

### ADJUDICATION

KRAFT, District Judge.

In this private antitrust action, involving booking and presentation of legitimate theatre attractions, after a lengthy trial to the Court upon the issues framed by our final pre-trial order and after careful consideration of the oral and documentary evidence, the stipulations, requests for findings of fact, conclusions of law and supporting memoranda of counsel, we find the following

## FACTS

### I. HISTORICAL BACKGROUND OF THE PARTIES AND THE LITIGATION

#### A. THE PLAINTIFF

1. The plaintiff, Goldlawr, Inc., was incorporated on August 31, 1950 under the laws of Pennsylvania.

2. Following its incorporation, Goldlawr, on September 19, 1950 issued 500 shares of its capital stock to William Goldman and 500 shares to Lawrence. Each paid $250 in cash and gave a personal note for $2,250. On the same day Goldman was elected President and Lawrence Vice-President and General Manager, which positions they held until June 25, 1956.

In June 1956 Lawrence transferred his 500 shares of Goldlawr stock to Goldman, making Goldman the only stockholder of Goldlawr. Tho sole consideration for this transfer was the assumption by Goldman of Lawrence's obligation upon his $2,250 note to Goldlawr. Lawrence and his nominees resigned as officers and directors of Goldlawr and were promptly replaced by nominees of Goldman who have served continuously since that date.

3. Goldman's entire cash investment in the stock of Goldlawr in the period September 1, 1950 to October 17, 1960 was $250. No payments on account of either promissory note have ever been made to Goldlawr.

4. By its charter Goldlawr was authorized to engage in a general theatrical and amusement business, including the presentation of legitimate attractions and the exhibition of motion pictures.

5. Goldlawr leased the Erlanger Theatre from the First Pennsylvania Company for Banking and Trusts from September 19, 1950 (as of September 1, 1950) until December 2, 1953; from November 24, 1954 through January 1, 1955; from October 1, 1955 to September 30, 1970.

6. Having retained counsel for that purpose, on or about June 15, 1956, Goldman caused Goldlawr to commence the present action claiming treble damages, injunctive relief and attorneys' fees for alleged violations of the antitrust laws for the period September 1, 1950 to October 17, 1960. Civil Action No. 21506 was begun on October 17, 1956; Civil Action No. 22092 was begun on February 18, 1957.

#### B. THE DEFENDANTS AND CO-CONSPIRATORS

7. The present defendants are:

(a) The executors of the estate of Jacob J. Shubert, deceased, who died December 26, 1963.

(b) The executors of the estate of John Shubert, deceased, who died November 17, 1962.

(c) The executors of the estate of Lawrence Shubert Lawrence, Sr., deceased, who died April 15, 1965.

(d) Select Theatres Corporation, a New York corporation, incorporated April 5, 1933.

(e) Modern Theatre Corporation, a wholly-owned subsidiary of Select.

(f) Barrymore Theatre Corporation, a wholly-owned subsidiary of Select.

8. The individuals and corporations, not defendants herein, who are claimed by the plaintiff to have engaged with the defendants in the conduct of which the plaintiff has complained are:

(a) The late Lee Shubert, who died December 25, 1953

(b) The late Marcus Heiman, who died September 9, 1957

(c) Milton Shubert

(d) United Booking Office, Inc.

9. Lee Shubert and Jacob J. Shubert were brothers. John Shubert was the son of Jacob J., a nephew of Lee and a cousin of Lawrence Shubert Lawrence, Sr. and of Milton Shubert. Lawrence, Sr. and Milton were brothers, nephews of Lee and JJ and cousins of John.

10. Lee and JJ entered into a formal partnership agreement on December 30, 1936, reciting, inter alia, that they had been co-partners doing business under the name of "Lee and J. J. Shubert" for a number of years, and providing that all profits or losses arising from the operations of the partnership venture should be equally divided. Through this partnership JJ was continuously engaged in the theatrical business until Lee's death.

11. After Lee's death, JJ continued the partnership business, individually and as the surviving partner, and took over sole and complete control of the business, which included approximately 75 closely held corporations owning theatres and other assets. He had final authority over bookings in Shubert-operated theatres in New York City.

12. Lee and JJ owned or controlled all of the preferred stock and a very substantial majority of the common stock of STC, which was incorporated in New York in 1933. Through STC and its numerous subsidiaries, Lee and JJ conducted their theatrical business enterprises.

13. John Shubert was the president and secretary of nearly all the Shubert-owned companies and until his death was very active in the Shubert theatrical business.

14. Lawrence Shubert Lawrence, Sr. was general manager of the Shubert-operated theatres in Philadelphia, Pa. and was an incorporator and, until June 1956, 50% shareholder of the plaintiff corporation.

15. (a) UBO was incorporated on June 9, 1932, as a result of the merger of the Shubert and Erlanger interests. A. L. Erlanger, who died in 1930, was succeeded by his nephew L. A. Bergman, who was associated with Marcus Heiman, a part-owner of the Erlanger Booking office.

(b) One half of UBO's stock was owned by STC and the other half by Marcus Heiman until his death.

(c) UBO was engaged in the business of booking legitimate theatrical attractions in theatres throughout the United States outside New York City.

(d) From 1933 to December 25, 1953 Lee Shubert was an officer and director; from 1933 to September 9, 1957 Marcus Heiman was an officer and director; from 1933 to 1958 J. J. Shubert was an officer and director.

(e) A certificate of dissolution of UBO was filed with the New York Department of State on March 27, 1958.

16. Through LAB Amusement Co., Marcus Heiman operated the following theatres: Biltmore in Los Angeles; Erlanger in Chicago; Colonial in Boston; Ford's in Baltimore; and Nixon in Pittsburgh (until 1950). On June 20, 1952 LAB transferred its interest to Heiman. Heiman had an interest in the National, Washington, and a 25 per cent interest in the Walnut, Philadelphia.

17. Milton Shubert operated the Shubert Theatre in Washington during a portion of the period 1950–1960.

## C. ABBREVIATIONS AND DEFINITIONS

18. The following abbreviations, where used, identify the following persons or corporations

JJ—Jacob J. Shubert
Lee—Lee Shubert
John—John Shubert
LSL—Lawrence Shubert Lawrence
WG—William Goldman
STC—Select Theatres Corporation
SOC—Select Operating Corporation
MTC—Modern Theatre Corporation
BTC—Barrymore Theatre Corporation
UBO—United Booking Office
IBO—Independent Booking Office
MH—Marcus Heiman
LAB—LAB Amusement Corporation
ATS—American Theatre Society, Inc.
TG—Theatre Guild, Inc.
NYC—New York City.

19. The following terms are used with the meanings stipulated by counsel as appears in the Notes of Testimony,

pp. 411–415: legitimate attractions; theatre; producer; presentation; operator; booking; Shubert-operated theatre; Heiman-operated theatre; franchise; affiliated theatre; independent theatre; try-out town; road-show town; and theatrical season.

20. The following terms are used herein with the following meanings:

(a) "suit period" means 1933 to October 17, 1960.

(b) "damage period" means the period from September 1, 1950 (the day after plaintiff's incorporation) until October 17, 1960.

(c) "government case" refers to United States of America v. Lee Shubert, et al., Civil Action No. 56–72, Southern District of New York, commenced on February 21, 1950.

(d) Shubert(s)—refers to Jacob J. Shubert, individually and as surviving partner of the firm of Lee and J. J. Shubert and the corporations owned by Lee and J. J. Shubert; Lee Shubert during his lifetime; John Shubert; Lawrence Shubert Lawrence; Select Theatres Corp. (including its subsidiaries, Modern Theatre Corp., Barrymore Theatre Corp. and other subsidiaries). Except as otherwise noted, the term refers also to the foregoing acting in concert together with Marcus Heiman; LAB Amusement Corporation and other corporations controlled by Heiman and United Booking Office.

21. The legitimate theatre business consists of production,[1] booking and presentation.

It is generally, but not always, true that production involves acquisition of the script, employment of the star, cast and other personnel, rehearsals, booking the attraction in a try-out city or cities, in New York City, and the road-show cities.

22. Booking involves the negotiation of arrangements, (generally, though not always, through a booking office,) between producers and theatre operators for the presentation of legitimate attractions in theatres, including contracts fixing playing dates and financial terms.

23. Presentation generally involves the operation of a theatre or theatres in which legitimate attractions are presented to the public by producers.

## II. THE RELEVANT THEATRICAL MARKET FOR LEGITIMATE ATTRACTIONS

24. Between 1932–50, the key try-out cities were: Philadelphia, Boston, Baltimore, and New Haven. Other try-out cities were Washington, Detroit, San Francisco, Toronto, Hartford and Princeton.

### A. PHILADELPHIA

25. During the relevant period, there were five theatres for presentation of legitimate attractions in Philadelphia:

(a) The Shubert was leased by the Shuberts from September 1, 1944 to July 24, 1946, when title was acquired and it was owned thereafter until December 9, 1957. It was operated by the Shuberts from September 1, 1944 to December 9, 1957, after which it was operated by William McKnight, through his manager, Samuel Schwartz.

(b) The Forrest was owned and operated by the Shuberts from August 1, 1938 until the end of the suit period, October 17, 1960.

(c) The Locust was leased and operated by the Shuberts through MTC from October 1, 1937 to September 30, 1957. During the 1957–1958 season the theatre was operated by Manny Davis. From May 1958 through October 17, 1960 it was operated by Wil-

---

[1] The defendants are charged by plaintiff with having engaged in violations of the antitrust laws only with respect to the booking and presentation of legitimate attractions. Defendants are not claimed by plaintiff to have violated the antitrust laws with respect to production, and no producers of legitimate attractions are claimed by plaintiff to be co-conspirators.

liam Goldman Theatres, Inc., a corporation wholly-owned by William Goldman.

(d) The Walnut was owned in part by the Shuberts through Ninth and Walnut Corporation from 1946 to January 1, 1956, and wholly-owned thereafter. It was operated entirely by the Shuberts between September 1, 1950 and October 17, 1960.

(e) The Erlanger Theatre was leased and operated by plaintiff, Goldlawr, Inc., from September 19, 1950 through December 2, 1953, from November 24, 1954 through January 1, 1955, and from October 1, 1955 through October 17, 1960.

## B. BOSTON

26. In 1950 the Shuberts controlled all 6 theatres in Boston. The Shuberts operated: Copley, Opera House, Plymouth, and Shubert. Heiman through LAB operated the Colonial. The Shuberts and Heiman jointly operated the Wilbur.

27. The Boston theatres controlled by the Shuberts were disposed of as follows after 1956: (a) Colonial—sold on November 1, 1958 to Princess Virginia Corp. (McKnight); (b) Wilbur—surrendered to landlord September 30, 1956; (c) Copley—leased on April 17, 1957 to Richard Davis who assigned to Copley Theatre Inc.; (d) Plymouth—leased on May 29, 1957 to Gary Theatre, Inc.; (e) Majestic—leased on June 30, 1956 to Saxon Theatre Corp.; (f) Boston Opera House—sold to S & A Allen Co. of Boston on September 25, 1957.

## C. NEW HAVEN

28. In New Haven the only theatre, the Shubert, was Shubert-operated before 1941. In that year a new corporate tenant, York Haven Enterprises, Inc., leased and operated the theatre. This agreement ws renewed in 1946 for a period of 5 years. After 1951 UBO continued to book the theatre in New Haven.

(a) On July 31, 1941 SOC entered into an agreement with the new tenant whereunder SOC was exclusively designated as the booking agent of the theatre for 5 years commencing on September 11, 1941.

(b) On May 22, 1946 SOC entered into an agreement with York Haven Enterprises, Inc. wherein SOC was to act as sole and exclusive booking agent for the theatre for 5 years to May 31, 1951, receiving 5 per cent of the gross receipts up to $10,000 and 2½ per cent thereafter. The contract also provided:

"During the term of this agreement Yorkhaven shall not assign, transfer or dispose of its lease of the theatre unless the assignee thereof agrees with Select in writing to be bound by the terms of this agreement and assumes the same."

(c) In an addendum to the contract UBO agreed that it would not book any theatre with legitimate attractions in the City of New Haven since SOC is the exclusive booking agent for the Shubert theatre there. UBO also agreed to make available to SOC all of the legitimate attractions booked by it or its affiliates for the purpose of having SOC book the Shubert theatre in New Haven.

(d) In 1955 JJ included New Haven as one of "our theatres."

29. The New Parsons Theatre in Hartford, Connecticut was operated by Philip Langner from 1951 to 1954. The Shuberts had no interest in the New Parsons Theatre.

## D. WASHINGTON, D. C.

30. Before 1950 the Belasco and National Theatres in Washington were once available for presentation of legitimate attractions and both were then controlled by the Shuberts-Heiman.

(a) The Belasco was kept "dark" prior to October 1933, and attractions sent to the National, Washington. The Heiman-Erlanger interests shared the cost of keeping the Belasco closed in 1932.

(b) In early 1937 a lease was executed for the Belasco between Washington Theatre Co. (by JJ), and J. Leventhal. The lease provided for the presentation only of old plays. Heiman objected to the Belasco playing Tobacco Road because it had refused to play his theatre in Pittsburgh.

(c) In September 1939 L. A. Bergman of Rapley Theatre Co. wrote Heiman confirming an arrangement

" * * * that the Belasco Theatre in Washington shall not play in legitimate shows in competition with the National * * * and we agree to pay you as a booking fee for your services in helping to secure attractions for the National, not to exceed 5% of the house share * * *."

(d) On March 19, 1940, Heiman summarized the general and Washington situation:

"The Booking Office is not involved in this. The facts are as you say— the Booking Office is owned fifty per cent by the Shuberts and fifty per cent by Mr. Bergman and myself.

These same interests have theatres throughout the country, and they have a pooling arrangement involving these theatres as to profits and losses.

Washington has been a separate arrangement between these same interests; on a fifty-fifty basis of profits and losses, excepting that Messrs. Bergman and Heiman have paid the Shuberts their share of Washington by a deduction of monies due them from Shuberts in other cities. The money now being paid me is to offset some of the losses on account of the Washington arrangement which permits the National Theatre to get the legitimate attractions exclusively."

(e) On March 24, 1943, Pitou of UBO advised Weinstock that Heiman said that they were not to book any more try-outs in Washington.

(f) In 1948 Heiman converted the National into a motion picture theatre. Louis Lotito, operator of eight non-Shubert theatres in New York City, took over operation of the National in 1952 and presented legitimate attractions there during each ensuing theatrical season.

(g) In 1951 Milton Shubert acquired the Shubert Theatre and presented legitimate attractions therein during the theatrical seasons 1950–51 through 1956–57.

### E. CHICAGO

31. In December 1943, Lee Shubert caused a new subsidiary of STC to be formed known as Harris & Schwyn Theatres, Inc. for the purpose of acquiring the title to the Harris and Schwyn theatres in Chicago. The purchase was concluded January 7, 1944.

(a) In 1944 Select Lake City Theatre Operating Co. a subsidiary of STC, leased the Studebaker Theatre, Chicago, for 10 years ending July 31, 1954.

(b) On February 15, 1945, Great Northern Amusement Co. assumed a lease between the Receiver and Pfeiffer and Goldberg entered into on June 21, 1943, covering the Great Northern Theatre, Chicago, the lease expiring on June 30, 1945.

(c) On March 5, 1945, Select Lake City Operating Co., as lessee, leased the Majestic Theatre, Chicago, for 5 years ending February 28, 1950, with an option for a further term of five years.

(d) On February 8, 1945, STC entered into a lease for the Civic Opera House, Chicago, for the purpose of presenting a season of musical operetta productions.

(e) On October 23, 1945, STC purchased 50 per cent interest in the Blackstone Theatre Company.

(f) The Shuberts in 1950 operated the following theatres in Chicago: Blackstone, Great Northern, Harris, Selwyn, Shubert, and Studebaker.

Heiman through LAB operated the Erlanger.

(g) As of May 1958 the Erlanger was retained by Heiman's estate. The Selwyn was leased on December 3, 1956 to Michael Todd with an option to purchase the Selwyn and Harris. The lease on the Studebaker was surrendered to the landlord on December 31, 1955.

## F. DETROIT

32. On October 13, 1932, D. T. Nederlander and Lee and JJ entered into an agreement regarding the Cass Theatre, Detroit. It asserted that the Shuberts had an interest in half of the common stock of a corporation which controlled the theatre, and the Shuberts agreed to pay Nederlander one-fourth of the net profits arising from the theatre. It was provided that the theatre "may be booked exclusively for productions owned or controlled" by the Shuberts.

(a) Detroit Downtown Theatre Corp., wholly-owned subsidiary of SOC, leased the Wilson Theatre, Detroit, from Wilson Amusement Co. until March 31, 1941.

(b) On August 20, 1941, Lee and JJ wrote to D. T. Nederlander confirming his 25 per cent interest in the Lafayette Theatre, Detroit. Lafayette Dramatic Productions, Inc., in which the Shuberts had a 50 per cent interest, leased and operated the Lafayette. Nederlander was given a 50 per cent interest in the Shubert's stock. A pooling arrangment with the Cass Theatre was contemplated and Nederlander would get his share of the profits. The agreement of October 13, 1932 was cancelled.

(c) A memo of September 25, 1942, regarding the Lafayette in Detroit, noted that Nederlander, Stair, Shubert and Heiman each had 25 per cent.

(d) As late as August 31, 1948, JJ authorized the issuance of stock to Stair and Heiman and the Shuberts, but he did not want the stock issued to Nederlander.

(e) The Shuberts in 1950 had an interest in the Cass and Shubert-Lafayette, Detroit.

(f) On February 17, 1956, the Shuberts and Stair interests were jointly interested in the Shubert-Lafayette and the Cass. They were both stockholders of Lafayette Dramatic Productions, Inc., which operated the theatre under lease dated June 9, 1945. Shubert and Stair stock interests were 50 and 25 per cent and D. T. Nederlander owned 25 per cent of the corporation that operated the theatre. The interests of the Shuberts and Stair in the Cass were set forth on a Declaration of Trust executed by Stair and JJ providing for an equal sharing of profits from the operation of the Cass. The lease of Lafayette Dramatic Productions, Inc. on the Shubert-Lafayette was terminated on August 31, 1957. After March 1, 1957 the theatre was operated by Nederlander.

## G. PITTSBURGH

33. The only theatre in Pittsburgh, Pa., the Nixon, was Heiman operated until 1948 when it was sold and demolished.

## H. CINCINNATI

34. The Shuberts owned the Shubert and Cox Theatres in Cincinnati which adjoined. As of May 1958, the theatres were retained by the Shuberts.

## I. LOS ANGELES

35. The only theatre in Los Angeles in 1950 was the Biltmore, which was Heiman operated.

## J. TOLEDO

36. On September 19, 1947 Town Hall Realty Co. leased to Pat Broder, the Town Hall, Toledo, Ohio, for five years ending October 31, 1952. The lease pro-

vided for certain renewal options. The lease provided also:

"Tenant agrees to present only such legitimate theatrical attractions as shall be booked by the United Booking Office, Inc., provided they are acceptable to the Tenant. Tenant agrees to sign, upon the demand of the United Booking Office, Inc., the regular and customary booking agreement for the full term of the lease effective only at such times as legitimate theatrical attractions are being presented at the theatre. The Tenant shall not be obliged to pay any charge or fee to United Booking Office, Inc., for the services rendered by the booking office."

The lessor agreed that:

"all Shubert controlled legitimate attractions will be presented at no other theatres in Toledo, Ohio * * *."

(a) The lease provided for a rental equal to ⅓ of the net profits actually realized from the presentation of attractions.

(b) In 1950 the Town Hall, Shubert-controlled, was the only theatre in Toledo.

(c) The Town Hall was sold on January 26, 1956 to Realty Parking Corporation.

### K. BALTIMORE

37. In 1950, Ford's Theatre was the only theatre in Baltimore. It was leased and operated by UBO and the lease was surrendered to the landlord on July 31, 1956.

### L. NEW YORK

38. The theatres in New York City are the most important to the producers, particularly the key theatres in the 44th and 45th Street area, controlled by Shuberts.

39. During the suit period, there were 32 theatres in New York City, at least 15 of which were operated at one or more times by the Shuberts. They had an interest in two other theatres.

40. They operated the Barrymore, Booth, Broadhurst, Broadway, Century, Cort, Golden, Imperial, Majestic, National, Plymouth, Royale, St. James, Shubert, and Winter Garden.

41. From 1933–1950, STC owned one-third of the corporation which operated the Music Box, and from 1950–1960 owned 50 per cent. From 1949–1952, STC had a one-third interest in the Lyceum, and from 1952–1960, a 100 per cent interest.

42. During each theatrical season between September 1, 1950 and October 17, 1960, although varying from season to season, the average number of theatres operating in New York City was 33.35 of which 17.60, or 52.77% were theatres which the Shuberts operated or in which they had an interest.

43. Between September 1, 1950 and October 17, 1960 a total of 744 legitimate attractions were presented in theatres in New York City, 48.92% of which were presented in theatres operated by or in which the Shuberts had an interest.

44. During the damage period, the Shubert share of the total number of presentation days at NYC Broadway theatres was an average of 57.81 per cent. The next largest competitor—City Investing had an average of 13.45 per cent of the market. Since the Morosco and Helen Hayes, NYC, were owned by Producers Theatre, City Investing's percentage of the market was appreciably less than 13.45 per cent.

45. New York City theatres owned by the Shuberts were disposed of in 1956–1957, as follows: St. James, sold July 29, 1957 to Scarborough House, Inc. (McKnight); National, sold September 26, 1956 to Playhouse Properties, Inc.; Elliott, sold July 23, 1956 to Urban Survey Corp.; Ritz, sold May 23, 1956 to John T. Javasile.

46. In 1960, the Shuberts operated 17 theatres in NYC.

## III. BOOKING OF LEGITIMATE ATTRACTIONS

### A. BASIC PRINCIPLES

47. Legitimate attractions were generally booked by their producers or their general managers.

48. Producers made New York City bookings through direct negotiation with the theatre operators and not through a booking office.

49. Producers generally booked New York theatres and out-of-town theatres separately and at different periods in time, since the New York booking generally preceded the out-of-town booking and because the producer's preference with respect to out-of-town bookings often depended upon the characteristics of the theatre in which the producer had engaged to play in New York.

50. Post-New York road-shows and pre-New York try-outs are booked in a different fashion. Try-out bookings are generally made separately and after New York City bookings.

51. Road-show bookings are made after the New York presentation has established the success of the attraction. Road-show tours are generally laid out by the producer, who then contacts the booking office far in advance in an attempt to arrange the entire tour at the same time.

52. Producers generally made out-of-town bookings through a booking office: through United Booking Office, Incorporated (UBO) in the period 1932–56 and Independent Booking Office, Incorporated (IBO) in the period 1957–60. Attractions were occasionally booked directly by the producer with the theatre operator without utilizing the facilities of a booking office.

### B. ORGANIZATION AND OPERATION OF UBO

53. Prior to 1932 there were two theatrical booking organizations, Klaw-Erlanger and Shubert. They merged in 1932 and became the UBO. Erlanger died in 1930 and was succeeded by his nephew Leonard A. Bergman who was associated with Marcus Heiman who, in turn, owned part of the Erlanger booking office.

54. In the period 1932 to 1956, UBO was the principal booking office in the United States, although other small booking offices existed from time to time.

55. The Shuberts, together with Heiman, were in active charge of the management, direction and operation of UBO during that period.

56. Illustratively, in the 1948–49 season UBO booked 100 attractions outside New York State. These attractions played 846 times in different towns in States other than New York and played 907 times in different theatres in all States.

57. UBO charged non-Shubert theatre operators a "booking fee" of 5 per cent of the gross receipts resulting from their presentation of legitimate attractions. Such a fee was similar to the commission paid by the operator to an agent or booking representative such as Alexander H. Cohen who maintained offices in N.Y.C. and booked attractions for Goldlawr from May 13, 1958 until August 26, 1960.

58. The booking office acted as an intermediary or middleman between the producer and theatre operator. The booking office would advise the producer upon the availability of various out-of-town theatres on the dates in which the producer was interested and would furnish other information concerning the capacity and stage dimensions of the various theatres and the terms which the theatre operator desired.

### C. BOOKING PRACTICES OF UBO 1932–1949

59. Between 1932 and 1948 the Shuberts usually conditioned the booking of attractions in *New York City theatres* upon agreements by the producers to book such attractions thereafter exclusively through UBO. In contracts providing for the presentation of attrac-

tions in theatres in that city controlled by the Shuberts they generally required the inclusion of a provision which obliged the producer to give to UBO the "exclusive right to book" the attraction in any and all cities "in the United States of America and Canada." This standard provision was as follows:

"As part consideration for the booking herein provided for, it is agreed that United Booking Office, Incorporated, shall have the exclusive right to book the said play in any and all cities in the United States of America and Canada. If the said play is being presented in the different cities, it shall receive the same terms in the same cities as other plays of like calibre and drawing power. Due consideration shall be given to the relative expense of the play and of the theatre in arriving at such terms."

In the record is a list of more than 425 such contracts with producers for different attractions.

60. During the period 1932–50 presentation in road-show cities was an integral part of the exploitation of an attraction, and a substantial part of its profits were so obtained. The successful operation of a theatre in a road-show city required the presentation of series of attractions so scheduled as to keep the theatre as continuously occupied as possible during the theatrical season. In the period 1932–50, operators outside of New York City were generally dependent upon a steady flow of legitimate attractions. Theatres in try-out and road-show cities supplied a market for an attraction which was of vital importance.

61. Between 1932 and 1948 the Shuberts very frequently conditioned the booking of attractions in theatres operated by the Shuberts in *try-out* cities upon agreements by the producers to book each of those attractions thereafter exclusively through UBO. In the record is a list of more than 360 such contracts containing a UBO exclusive booking clause.

62. The Shuberts frequently utilized the UBO exclusive booking provision in connection with booking contracts for attractions in the theatres controlled by them in Philadelphia during the period January 12, 1944 to March 2, 1946.

63. The booking monopoly was frequently used from 1932 to 1949 to favor Shubert or Shubert-affiliated theatres in try-out and road-show cities to the detriment of non-affiliated theatres in such cities.

64. Even producers of "smash hits" such as Oscar Serlin of "Life With Father" were not immune from the exercise of the Shubert monopoly power.

65. In the years 1940–41 Serlin attempted independently to arrange a national tour of his attraction in road-show cities throughout the United States.

66. His efforts to book theatres were frustrated by the Shuberts and UBO until Serlin capitulated and agreed to accept the Shubert terms which were discriminately unfavorable as a condition precedent to booking the tour through UBO for the season 1942–43.

### D.  BOOKING PRACTICES OF UBO 1949–1960

67. After 1949 the obtaining of an out-of-town booking by a producer was not conditioned or dependent upon the producer's booking his attraction in a Shubert-operated theatre in New York City nor was the obtaining of a booking in a New York Shubert theatre dependent or conditioned upon the booking of the attraction in a Shubert-operated theatre outside New York City.

68. After 1949 producers frequently presented their attractions in non-Shubert theatres outside New York City and Shubert theatres in New York City, as well as in Shubert theatres outside New York City and in non-Shubert theatres in that city.

69. After 1949 producers desiring to present their attractions in non-Shubert theatres outside New York City were not discouraged or prevented from doing so by the Shuberts or by UBO; nor were

those who did so penalized or discriminated against by the Shuberts or UBO for having done so.

70. Grants by producers to UBO of the exclusive right to act as booking agent of the attraction involved were not required by the Shuberts during the period 1950–1960, the elimination having occurred about 1948.

71. Thereafter the producer selected the cities in which his attraction was to be presented, as well as the theatre in each such city.

72. The producer's choice of city and the producer's selection of the theatre or theatres in which his attraction was presented was based on the exercise of the producer's own free judgment.

73. UBO ceased doing business on approximately December 29, 1956.

74. At no time between September 1, 1950 and October 17, 1960 did plaintiff intend or seek to engage in the business of booking legitimate attractions in theatres operated by others.

75. UBO acted as booking agent for the Erlanger from September 1, 1950 until the transfer to Goldman of Lawrence's stock interest in the plaintiff and rendered booking services to the Erlanger without charge during that period.

76. After the date on which UBO ceased doing business, defendants did not engage in the business of booking legitimate attractions in theatres other than those operated by defendants. At about the time UBO ceased doing business, a group from the League of New York Theatres were instrumental in the formation of Independent Booking Office, Incorporated (IBO), which was created to perform booking services for producers and theatre operators outside New York in the place of UBO. The Shuberts were not members of the League of New York Theatres and did not participate in the formation of IBO, which has been functioning since 1957.

77. IBO was not, at any time after it began to function, owned, controlled or dominated by the Shuberts.

78. In the period 1957–1960 the Erlanger was booked, in part, by IBO. From the beginning of the 1957–1958 theatrical season through October 17, 1960, a total of 16 attractions were presented at the Erlanger. IBO was active in connection with the booking of 14 of these 16 attractions.

## IV. POOLING OF THEATRES BEFORE 1950

79. On September 24, 1929, a then typical agreement was entered into regarding the Pitt and Alvin Theatres, Pittsburgh, for the period August 1, 1929 to April 26, 1938. As explained by William Klein, attorney for Lee, in a memorandum to Lee and JJ and others:

"Shubert is the sole booking agent for both houses during the term of the agreement. No attractions may be presented there unless booked by you. * * *

If you decide to become interested in any other theatre in Pittsburgh, you must first offer to place the theatre in the pool. * * * "

80. After 1932 the Shubert and Erlanger theatres were booked "out of one office, the United Booking Office."

81. With the merger of the Klaw-Erlanger and the Shubert booking offices in 1932 came, as well, the pooling of the theatres of the two circuits. The Shuberts and Heiman pooled their theatres and agreed not to compete with each other.

82. This substantially reduced competition in the presentation of attractions through nationwide and local pooling arrangements. The Shuberts and Heiman systematically attempted to enlarge their theatre holdings, often at the expense of independent operators.

83. During the 1938–39 season there was a pool described as the "Shubert-Select, Heiman-Bergman Pool" which included the following theatres: Copley, Boston; Plymouth, Boston; Harris, Chicago; Selwyn, Chicago; Chestnut St. Opera House, Philadelphia; and Nation-

al, Washington. Lee and Heiman had beneficial interests.

84. On May 29, 1943, SOC by JJ general manager, and Lou Waters, entered into a license agreement to use the title Artists & Models in connection with an attraction on a royalty basis. Included in the agreement was the provision:

"You further agree that all productions presented by you hereunder shall be presented only in such theatres as may be owned, operated, controlled or booked by us or the United Booking Office, Inc. and in no other theatres whatsoever without our written consent. * * * "

85. In early 1942, the Heiman-Bergman interests and Lee, JJ and STC (and all of their affiliated interests) agreed to a further pooling arrangement for three years from July 1, 1942. It was recognized that the Shuberts controlled designated theatres in the following cities: Philadelphia, Boston, Chicago, Cincinnati, and New Haven; that Heiman controlled designated theatres in the following cities: Boston, Washington, Chicago, Pittsburgh, Buffalo, Los Angeles and Baltimore; that the Shuberts and Heiman had 50 per cent interests each in designated theatres in: Boston and Philadelphia; and that designated theatres would be controlled in Detroit. UBO was to take a lease for the benefit of the respective interests in Ford's, Baltimore. It was provided, inter alia, that:

"7. All of the above theatres are to be booked exclusively through the United Booking Office (except the Shubert Theatre in New Haven, which is booked by Select). No charges for booking are to be made by the United Booking Office against any of these theatres, except as stated in the next paragraph.

9. If either the Heiman-Bergman Interests or the Shubert-Select Interests should lose any of the above theatres it will have the right to acquire another theatre in the city or town to replace the theatre so lost. Except for the above right to acquire theatres for legitimate productions, neither party has the right to acquire any additional theatre, except pursuant to the requirements of paragraph 11.

10. Neither party will acquire any theatre in which the other had an interest without the consent of the other party.

11. Neither party can acquire any theatre in any other cities without offering the other party a 50% interest therein."

## A. FRANCHISE AGREEMENTS
### 1932 to 1947

86. In the years prior to 1947, UBO entered into yearly franchises, identical in form, with theatre operators throughout the country. Each franchise described UBO as:

"Booking the Principal Legitimate Theatres and Attractions in the United States and Canada."

The franchise recited that:

"WHEREAS the party of the first part [UBO] controls the booking and playing of first class theatrical attractions throughout the United States and Canada, and

WHEREAS the party of the second part [the theatre operator] is desirous of securing the presentation of attractions thus controlled by [UBO] and is desirous of arranging with [UBO] for the production of such and other plays [at its theatre] * * * "

87. The franchise provided that the theatre operator engaged the services of UBO "for the exclusive booking of attractions" and that the operator "irrevocably appointed UBO the sole and exclusive booking agent." The theatre operator agreed to pay UBO compensation of 5 per cent of the operator's share of the gross receipts of all legitimate attractions played by the operator during the term of this agreement. The franchise provided that the operator would not, during the term of the agreement, "sell, assign, transfer or dispose of his lease"

of the theatre without the written consent of UBO.

88. The Shuberts through UBO agreed not to book competing theatres. These franchises were a powerful anti-competitive tool used against independent operators.

89. In many instances, even though a theatre had a franchise with UBO there were seasons from 1932–46 when, despite the existence of the franchises, no attractions were booked into the theatre.

90. Included in Exhibits P–517 to P–991 are more than 460 franchises. These franchises, in part, involve road-show cities and fall within the period 1935 through 1945.

91. Until 1946, UBO had entered into formal written franchises. Although formal franchises were generally not issued after 1946 the same pattern of booking continued until 1950.

## B.  LEASING OF THEATRES
### 1932–1950

92. Prior to 1950 the Shuberts conditioned the leasing of the theatres under their control upon agreements by the respective lessees not to utilize the leased theatres for the presentation of attractions.

93. In the years 1935–1948, the Shuberts leased ten theatres under their control in NYC, Boston, Washington and Cincinnati to others with contractual provisions which prohibited the lessee from using the theatre to present legitimate attractions.

## V.  COLLATERAL ENTERPRISES NECESSARILY INVOLVED IN THE PRESENTATION OF LEGITIMATE ATTRACTIONS

## A.  ADVERTISING

94. Prior to 1950 the Shuberts frequently conditioned the booking of attractions into their New York City theatres upon agreements by the producers to place advertising only as directed by them, employing a contract provision substantially as follows:

"Attractions playing this Theatre shall advertise only through Blaine Thompson Company in such papers as are approved by the Manager of the Theatre and place such advertising only through such advertising agencies as the party of the first part shall designate. No billing or advertising of any kind shall be done by the party of the second part without the written consent of the party of the first part and a violation of this clause shall be considered a violation of the whole contract."

95. The record contains a list of more than 255 such contracts with producers containing such a provision and pertaining to attractions presented in New York City during the period 1936–48.

96. The advertising so handled by Blaine Thompson Company for the Shubert theatres during the 15 year period prior to 1946 amounted to more than 5 million dollars.

## B.  COSTUMES

97. Stage Costumes, Inc. was a subsidiary of STC which repaired and rented costumes to be used for professional and amateur productions.

## C.  MUSICAL COMPOSITIONS

98. STC and Producing Associates, Inc. agreed on June 17, 1935 with Harms, Inc. to organize International Music Corp. The Shuberts gave the new corporation performing rights to musical compositions owned by STC or Producing Associates, Inc. for a period of five years.

## D.  PRODUCTION

99. Producers of legitimate attractions usually raised financial capital by soliciting investments from others. The legal relationship was that of a limited partnership in which the producer was the general partner and the investors limited partners. The investors, as distinguished from the producer, did not ordinarily participate in any manner in making business or artistic decisions or booking arrangements. Generally, such decisions and arrangements were made

solely by the producer and his general manager.

100. During the period 1932–50 Lee and JJ, through corporations controlled by them, engaged in the production of attractions, the booking and presentation of which they controlled. Between 1933 and 1949 they produced 133 such attractions.

101. During the period 1933–49 the Shuberts invested in attractions in number and amount, as follows:

|          | Number | Amount        |
|----------|--------|---------------|
| Shuberts | 275    | $3,588,392.   |
| Heiman   | 41     | 36,807.       |
| LAB      | 29     | 99,725.       |
| UBO      | 16     | 119,407.      |
| Total    | 361    | $3,844,331.   |

102. In many instances it was provided that booking would be exclusively with UBO or the Shuberts.

103. In numerous instances between 1939 and 1948 the Shuberts obtained an interest in the profits of an attraction in consideration of their furnishing bonds for the payment for the salaries of actors, managers, press agents and stage hands. The Shuberts' obligations were invariably to be repaid before any other moneys were repaid. In many situations it was also provided that bookings should be made through UBO or the Shuberts.

104. Between September 1, 1950 and October 17, 1960 the Shuberts did not engage in the business of producing legitimate attractions and seldom made investments in attractions produced by others.

105. On those occasions after September 1, 1950 on which the Shuberts did make investments in shows produced by others, the Shuberts did not participate in any way in any business, artistic or booking decision of any kind relating to the attraction.

## E. TICKETS

106. On July 20, 1933, STC entered into a contract with Public Service Ticket Office and the Estate of Joseph Leblang extending the time for payment of the note of $95,000 held by STC until September 1, 1934, and giving STC 25 per cent of the net profits of the business at the ticket office for the period September 1, 1933 to September 2, 1934.

107. In December 1935, a further agreement was entered into with Public Service Ticket Office, Inc. giving STC 25 per cent of the profits of the:

"business of Public Service Ticket Office for any tickets they may sell on our theatres or attractions or theatres or attractions of Messrs. Lee and JJ Shubert. * * *"

108. A further agreement was entered into with Leblang-Grays, Inc. in reference to the original note of Public Service Ticket Office, Inc. in the sum of $95,000. STC was to receive 33⅓ per cent of the net profits of Leblang-Grays, Inc. for their ticket business for the period December 1, 1942 to November 30, 1943.

109. In July of 1948, there was still a balance unpaid on the note of Public Service Ticket Office, Inc.

110. In the period prior to 1956, the Shuberts received as a concession, 25 cents per ticket for each ticket sold in Philadelphia through a ticket agency. The plaintiff also received concession money from Philadelphia ticket agencies, which amounts were computed, paid by the ticket agencies and received by the plaintiff during the same period on the same basis as did the Shubert-operated theatres in Philadelphia.

111. In Philadelphia, the amount derived from the sale of tickets to attractions to brokers at prices in excess of the box office price as printed during the period January 1, 1945 to November 10, 1956, exceeded the sum of $95,000, as follows:

| Forrest | $37,871.25 |
|---------|------------|
| Locust  | 9,538.50   |
| Shubert | 40,061.75  |
| Walnut  | 10,090.50  |

112. The practice of making house seats available to theatre operators and to producers was a usual and customary

practice in the legitimate theatre business engaged in by all theatre operators, including plaintiff.

113. Punched tickets are tickets which are exchanged by the producer for free advertising, and are utilized by the producer as a device to promote an attraction which is not selling out, in an effort to use every possible means to keep the show running.

## VI. AMERICAN THEATRE SOCIETY (ATS) THEATRE GUILD (TG)

### A. 1950–1960

114. ATS provided subscription seasons of attractions in certain cities and sold tickets for such attractions which were presented by TG.

115. The TG was controlled by the Langner family. The Shuberts had nothing to do with the TG. The TG owned a half interest in the ATS, which was an entirely separate organization. . The Langners owned the controlling stock in the American Theatre Society and the Shuberts owned a stockholding interest.

116. The Shuberts were not in control of the selection of attractions to be sponsored by the Theatre Guild-American Theatre Society. Theatre Guild attractions were presented in non-Shubert as well as Shubert theatres. Only approximately 10% of attractions sponsored by the American Theatre Society were Theatre Guild attractions.

## VII. GOVERNMENT CASE

117. The United States began an investigation into the activities of the Shuberts in 1946. The action of United States v. Lee Shubert, et al., United States District Court for the Southern District of New York, Civil Action No. 56–72, ["government case"] was commenced on February 21, 1950 and was terminated by the entry of a consent decree on February 17, 1956.

118. Defendants in the government case were: Lee; JJ; Heiman; UBO; STC; and LAB. Neither Lawrence,

John Shubert, Modern or Barrymore were named as parties nor identified as co-conspirators in the government case.

119. The defendants in the government case, as of mid-1950, operated approximately 40 theatres in 8 states.

## VIII. DAMAGE PERIOD 1950–1960

### A. FORMATION OF GOLDLAWR, INC.

120. The formation of the plaintiff corporation and the association therein of Lawrence and Goldman occurred as a result of Goldman's approach to Lawrence. Goldman was very friendly with Lawrence at the time of the formation of plaintiff and thereafter. He had known Lawrence as early as 1929. Goldman first solicited Lawrence to go in with him on the venture in 1947 or 1948. Lawrence refused Goldman's suggestion at that time, but later Goldman went to Lawrence and urged him. Goldman said to Lawrence, "It is your omelet. Scramble it the way you like."

121. William Goldman knew, of course, long prior to the formation of Goldlawr, of the pendency and nature of the Government's suit against the Shuberts.

122. After their first meeting regarding the formation of the plaintiff, LSL subsequently came back to Goldman and said that he had talked with Lee and Lee consented to LSL going ahead with WG on a partnership basis and that Lee would provide shows for the Erlanger. LSL brought WG a cablegram from Lee from Paris dated June 23, 1950 stating:

"TELL GOLDMAN WE WILL GUARANTEE AT LEAST THIRTEEN WEEKS OF LEGITIMATE SHOWS ADVISE YOU MAKE DEAL WITH HIM."

123. Lawrence thereafter was instrumental in obtaining such an agreement from Lee Shubert, by which Lee Shubert agreed to attempt to supply 13 weeks of bookings a year or, in default thereof, to pay $1,000 a week for each week of

attractions fewer than 13 presented at the Erlanger each season.

124. Lee Shubert was interested in helping the venture because Lawrence was his nephew. Goldman had a high regard for Lee Shubert and continued to have such regard for him until his death. Subsequent to Goldman's conversation with Lawrence, Lee Shubert, Goldman and Lawrence had a meeting in Goldman's office in Philadelphia at which Lee Shubert said "You know, Larry is my favorite nephew, and I am delighted that you two boys are going to get together and operate the Erlanger Theatre * * You can be assured of my cooperation and that I will help you make a success of it."

125. On August 15, 1950, a written agreement was entered into between Lee and UBO on one part, and Goldman and LSL on the other part, reciting in part that: (a) Goldman and LSL were about to form the plaintiff corporation, which proposed to lease the Erlanger from the Bank for a term of 10 years beginning on September 1, 1950; (b) in order to obtain the said lease it was necessary for Goldman and LSL to obtain an agreement that Lee and UBO "will supply Goldlawr, Incorporated with legitimate attractions for at least thirteen weeks a year during the ten year term of such lease." The agreement provided that: (a) Lee and UBO agree, jointly and severally, that Lee and UBO will supply the plaintiff with legitimate attractions to be performed at the Erlanger for at least 13 weeks during each year (September 1 to August 31) of the 10 year term of the lease; Goldman and LSL agree to cause the plaintiff to be formed, and agree that, when formed, it will lease the Erlanger from the Bank for such term of 10 years, and agree that attractions supplied by Lee or UBO under the terms of the agreement will be performed at such theatre; (b) if Lee and UBO shall fail to supply the attractions as required by the agreement, they shall pay to plaintiff the sum of $1,000 as liquidated damages for each week that such attractions are not supplied, and the lia-

bility of Lee and UBO under the agreement shall not be in excess thereof; (c) if the lease shall be terminated for any reason before the expiration of such 10 year term, then the agreement shall terminate at the same time. A rider attached to the lease refers to the possibility of a decree in the Government case which had been commenced on February 21, 1950.

126. On August 19, 1950, a second written agreement was entered into between Lee and the plaintiff, containing recitals similar to those of the August 15th agreement, and providing that: (a) Lee agrees that he will supply the plaintiff with attractions to be performed at the Erlanger for at least 13 weeks during each year of the 10 year term of its lease; (b) the plaintiff agrees that it will lease the theatre from the Bank for such term of 10 years and agrees that attractions supplied by Lee under the agreement will be performed in such theatre; (c) if Lee shall fail to supply the attractions as required by the agreement he shall pay to the plaintiff the sum of $1,000 as liquidated damages for each week that such attractions are not supplied, and the liability of Lee shall not be in excess thereof; (d) if Lee shall be restrained by decree or order of a court of competent jurisdiction of any branch of the Federal or State Governments entered as the result of any proceeding, or as the result of the settlement of any such proceeding, then such restraining order or decree shall constitute a release of any further performance and of any further liability under the agreement.

127. Goldlawr was incorporated, as earlier indicated, on August 31, 1950. On September 19, 1950, 1000 shares of common stock were issued, one-half to Goldman, one-half to Lawrence. The first meeting of the Board of Directors was held at which Goldman was elected president and Lawrence vice-president and general manager, and a lease executed by the First Pennsylvania Company and Goldlawr for the Erlanger Theatre.

128. The lease of the Erlanger by the Trustees to the plaintiff provided that the lessee "shall use the leased premises only for the presentation of first class legitimate theatrical attractions, photoplays, moving pictures, and television programs."

129. The Bank was trustee for the Erlanger Theatre First Mortgage Bondholders, and was the entity entitled by law to grant a leasehold interest in the Erlanger at all times between September 1, 1950 and September 10, 1957. The lease of 1950 with the plaintiff was terminated by the lessor pursuant to notice dated September 2, 1953, pursuant to paragraph 3 of the lease.

### B. GOLDLAWR-SHUBERT AGREEMENT 1950–1953

130. On August 30, 1950, the office of Maurice Bower Saul, Esquire, wrote to Weir regarding a request that UBO be released from the guarantee contained in the August 15th agreement, saying:

"In view of the fact that the large bondholders have been informed that the guarantees of Lee Shubert and United Booking Office have been given, they had no objection to the leasing on the basis of those guarantees, the bondholders' committee does not see how they can agree to the release of the United Booking Office."

131. However, on September 21, 1950, the office of Maurice Bower Saul, Esquire, wrote to the Bank noting:

"The booking agreement has been rewritten so as to omit all reference to United Booking Office and copies of the revised agreement have been sent to New York for execution by Mr. Lee Shubert. When these executed copies are returned I will deliver to Mr. Milton Weir for cancellation the booking agreement of August 15, 1950 which was executed by Mr. Shubert and United Booking Office."

132. On September 4, 1951, LSL's secretary, upon his instruction, sent a check received from Lee for $2,000 to Goldman. On September 5, 1951, Gold-

man wrote to Lee returning the check saying:

"We had a gentleman's agreement that I would not expect you to pay me any money, and I intend to honor my word. I do appreciate your good intention, and I hope for a better operating season for the ensuing year."

133. On September 20, 1951, Lee wrote to WG saying:

"I am sorry that more shows did not play at the Erlanger Theatre last season, but our theatres throughout the country had very few shows * *."

134. On December 2, 1953, LSL wrote to J. F. Waters of STC:

"You have a guarantee on the Erlanger Theatre in Philadelphia of $13,000 per year or 13 weeks of bookings. As the Goldlawr, Inc. lease on this theatre expired on December 1st there appears to be the amount of $3,250 due * * *.

Will you please have Mr. Lee send me a check * * * as we must pay all our bills up to and including December 1st, 1953, after which Mr. William Goldman and myself will arrange for a new lease with the Pennsylvania Company on better terms excluding Mr. Lee Shubert.

For your information Mr. Shubert is now, as of December 2nd released from his guarantee as to 13 weeks booking or indemnity."

The plaintiff received the requested final payment of $3,250 from Lee Shubert on December 8, 1953.

135. Although the Agreement of August 19, 1950 was in the name of Lee Shubert, it was performed by Select through its subsidiary Select Operating Corporation ["Select Operating"].

(a) On August 24, 1951 Select Operating forwarded a check in the amount of $2,000 to Goldlawr for the year ending August 31, 1951 pursuant to the Agreement.

(b) On August 15, 1952 Lawrence forwarded to Loudermilk a check in the amount of $10,000 for the year ending

August 31, 1952 pursuant to the Agreement which payment was made by Select Operating.

(c) On September 3, 1953 a check in the amount of $6,000 payable to Goldlawr, Inc. for the year ending August 31, 1953 was sent to Lawrence pursuant to the Agreement which payment was made by Select Operating.

(d) On December 8, 1953 a check in the amount of $3,250 payable to Goldlawr was sent to Lawrence pursuant to the Agreement for the period September 1, 1953 to December 1, 1953 which payment was made by Select Operating.

136. Plaintiff received and accepted the benefits and performance of Lee's agreement of August 19, 1950 and Lee Shubert caused it to be fully performed.

## C. PERIODS OF OPERATION OF ERLANGER BY GOLDLAWR

137. During the periods September 1, 1950 to September 3, 1953, and October 1, 1955 to October 17, 1960, Goldlawr had a written lease on the Erlanger.

138. Between December 2, 1953 and October 1, 1955 the Erlanger Theatre was available for lease by the Trustee, for a satisfactory rent, to anyone who would be an unobjectionable tenant in accordance with the landlord's fiduciary policy of obtaining the most money possible for the bondholders.

139. Plaintiff did lease the theatre through Lessor's agent, on occasion, during the period November 24, 1954 to January 1, 1955, at a rental of $750 a week.

140. By written lease dated January 11, 1955, the plaintiff leased the theatre for a 10 year period commencing on October 1, 1955. By agreement dated April 22, 1957, the plaintiff and the Bank extended the lease for an additional period of 5 years from October 1, 1965 to September 30, 1970.

141. At an auction sale held September 6, 1957, Goldman's William Goldman Theatres, Inc. purchased the Erlanger from the Bank for the sum of $530,000. The then existing lease for the theatre with the plaintiff was assigned to the purchaser.

## D. EFFORTS OF LAWRENCE TO SECURE BOOKINGS FOR ERLANGER

142. From the time of the incorporation of Goldlawr until he assigned his stock therein to Goldman, Lawrence had the principal responsibility for obtaining bookings for the Erlanger. Lawrence told everyone he could that he was interested in the Erlanger and was seeking bookings for it.

143. Lawrence was interested in obtaining as many shows as he could for the Erlanger, because he personally would profit more from shows playing the Erlanger than he would if they played the Shubert theatres in Philadelphia. Lawrence informed UBO of his interest in the Erlanger and that he was seeking bookings for the theatre. The personnel in charge of UBO had knowledge of Lawrence's interest in the Erlanger. In addition, Lawrence went directly to producers to get them to present their attractions at the Erlanger.

144. Lawrence sought to persuade the producer of RED, WHITE AND BLUE to present that attraction at the Erlanger during the 1950–51 theatrical season.

145. Lawrence and J. J. Shubert attempted to persuade the producer to play SOUTH PACIFIC at the Erlanger.

146. Lawrence tried to get SOUTH PACIFIC into the Erlanger and talked with Morris Jacobs, the general manager of Rodgers and Hammerstein, the producers, and pleaded with him to play the Erlanger. Lawrence wanted SOUTH PACIFIC to play the Erlanger because he would profit more from the show playing the Erlanger than he would if it played in a Shubert theatre. Lawrence also called Dick Rodgers, whom he knew very well, and asked Mr. Rodgers if he wouldn't consider the Erlanger.

147. J. J. Shubert called Jacobs on the phone and asked him to play SOUTH PACIFIC at the Erlanger Theatre. J. J. Shubert was anxious to have SOUTH

PACIFIC play the Erlanger because Lawrence was his nephew. Thereafter, J. J. Shubert wrote to Rodgers and Hammerstein recounting his conversation with Jacobs and requesting Rodgers and Hammerstein as a personal favor to play SOUTH PACIFIC at the Erlanger.

148. Despite such efforts to obtain the booking for the Erlanger, Messrs. Rodgers, Hammerstein and Jacobs refused to play the Erlanger. Jacobs told J. J. Shubert that he didn't like the theatre and was not interested in it.

149. He further told Lawrence that he would play the Shubert or Forrest and if Lawrence didn't like it, he would play any hall he could find and, if not, he would not come to Philadelphia. Jacobs told Small that he absolutely refused to play the theatre "he said they were building a subway up there, that it was a barn, that it was a moving picture house and that he didn't want any part of it."

150. SOUTH PACIFIC was presented at the Forrest Theatre in Philadelphia for a period of 97 days from September 27, 1954 to January 1, 1955. SOUTH PACIFIC had a longer run than any other attraction presented in Philadelphia between September 1, 1950 and October 17, 1960 and earned a house share of $118,680.15, greater than any other attraction presented in Philadelphia of which there is evidence in the record.

### E. ERLANGER BOOKINGS 1950–1956

151. A total of 18 attractions were presented at the Erlanger in the 1950–56 period. Substantially all of these attractions were booked through UBO or were obtained as a result of Lawrence's efforts.

(a) LADY FROM PARIS was presented at the Erlanger from September 26, 1950 to October 7, 1950. The attraction was booked through UBO and Lawrence was active in connection with the booking. The Shuberts cooperated in an effort to make the presentation a successful one by permitting the use of the Shuberts' First Night Club and by authorizing the use of heralds advertising LADY FROM PARIS in other Shubert theatres in Philadelphia.

(b) STREETCAR NAMED DESIRE was presented at the Erlanger from October 9, 1950 to October 21, 1950. The attraction was booked through UBO, and Lawrence was active in connection with the booking.

(c) GUYS AND DOLLS was presented at the Erlanger from October 30, 1950 to November 18, 1950. The attraction was booked through UBO. GUYS AND DOLLS had been playing at the Shubert Theatre in Philadelphia and Lawrence persuaded them to play the Erlanger instead of moving to Pittsburgh.

(d) THE INNOCENTS was presented at the Erlanger Theatre from January 15, 1951 to February 3, 1951. The attraction was booked through UBO.

(e) THE MAN WHO CORRUPTED HADLEYSBURG was presented at the Erlanger from April 14, 1951 to April 21, 1951. Lawrence was the producer of the attraction, and acted as booking agent for the Erlanger.

(f) APOSTOLIC CHURCH (a local presentation) was presented at the Erlanger from September 1, 1951 to September 9, 1951. Lawrence was active in connection with the booking.

(g) GENTLEMEN PREFER BLONDES was presented at the Erlanger from April 7, 1952 to April 19, 1952. The attraction was booked through UBO. Lawrence Shubert Lawrence persuaded the producer to play the Erlanger.

(h) GOOD NIGHT LADIES was presented at the Erlanger from September 8, 1952 to October 4, 1952. The attraction was booked through UBO. Lawrence was active in connection with the booking.

(i) MAID IN THE OZARKS was presented at the Erlanger from November 3, 1952 to November 15, 1952. The attraction was booked through UBO. Lawrence was active in connection with the booking.

(j) MASK & WIG (a local show) was presented at the Erlanger from November 21, 1952 to November 29, 1952. Lawrence Shubert Lawrence obtained the booking for the Erlanger.

(k) THE FIFTH SEASON was presented at the Erlanger from January 12, 1953 to January 17, 1953. The attraction was booked through UBO. The attraction had been playing at the Walnut and Lawrence persuaded the producer to move over to the Erlanger.

(l) MAID IN THE OZARKS was presented at the Erlanger from March 30, 1953 to April 18, 1953. The attraction was booked through UBO. Lawrence was active in connection with the booking.

(m) HOUSE OF FLOWERS was presented at the Erlanger from November 24, 1954 to December 25, 1954. The attraction was booked through UBO. Lawrence was active in connection with the booking.

(n) BLACKSTONE was presented at the Erlanger from December 27, 1954 to January 1, 1955. Lawrence and UBO were active in connection with the booking.

(o) PAJAMA TOPS was presented at the Erlanger from January 17, 1955 to January 29, 1955. The attraction was booked through UBO. Lawrence was active in connection with the booking.

(p) MY FAIR LADY was presented at the Erlanger from February 15, 1956 to March 10, 1956. Lawrence Shubert Lawrence obtained the booking for the Erlanger. Herman Levin, the producer, had a contract with J. J. Shubert for a Shubert theatre for the presentation of MY FAIR LADY. Levin wrote a letter to John Shubert stating that he preferred to play the Shubert rather than the Erlanger but if the terms were better, he would play the Erlanger in preference to the Shubert. Lawrence thereafter went to New York and met with Herman Levin and his general manager, Phil Adler, who stated that they would play the Erlanger if they could get a better deal for the Erlanger and if Lawrence could obtain a release from J. J. Shubert. Lawrence then went to see J. J. Shubert to persuade J. J. to release Levin from the agreement. J. J. Shubert said to Lawrence "all right * * * you are my nephew * * * tear up the contract and you can have the show for the Erlanger.

(q) LI'L ABNER was presented at the Erlanger from October 23, 1956 to November 10, 1956. LI'L ABNER was the first attraction presented at the Erlanger Theatre after Lawrence terminated his interest in the plaintiff corporation. The attraction was booked through UBO.

(r) RING AROUND ROSIE was presented at the Erlanger from November 11, 1956 to November 24, 1956. It was a local show not booked through any booking office. RING AROUND ROSIE was the last attraction presented at the Erlanger prior to UBO's termination of business.

152. UBO acted as booking agent for the Erlanger from 1950 until it ceased doing business, in early 1957.

153. TONIGHT IN SAMARKAND was booked into the Erlanger through UBO during the 1954–1955 theatrical season, although the attraction was never presented there.

154. UBO protected time for ANKLES AWEIGH at the Erlanger during the 1955–1956 theatrical season, although the attraction was not presented there.

155. UBO marked SEVEN YEAR ITCH "on side" at the Erlanger during the 1955–1956 theatrical season, although the attraction was never presented there.

F. GOLDMAN - LAWRENCE — 1956

156. By no later than March 1956, Goldman knew that the government suit had been terminated by a consent decree and that Lawrence had either to sever his relationship with the Shuberts or terminate his interest in Goldlawr. Goldman also knew that if Goldman did not acquire Lawrence's stock, The First Pennsylvania Company had the right to terminate Goldlawr's lease of the Erlanger.

157. Exhibit A to the Consent Judgment in the government case is an Agreement between the Shuberts (JJ individually and as surviving partner of the firm of Lee and JJ and STC) and LSL, on the one hand and the United States on the other, under which it was stated in part:

"By the end of one year from the date of entry of the Judgment, Lawrence will either dispose of his financial interest in the Erlanger Theatre or resign as an employee of the Shubert defendants. If at the end of that year Lawrence shall have a financial interest in the Erlanger Theatre and shall not have resigned as an employee of the Shubert defendants, the Shubert defendants shall forthwith terminate Lawrence's employment with them and cease making any remuneration to him."

158. LSL elected to go with the Shuberts.

159. Goldman paid nothing to Lawrence for his stock. The only consideration for the transfer, as stated before, was the assumption by Goldman of the obligation of Lawrence under his $2,250 note to Goldlawr, which note has never been paid.

160. Goldman had been giving consideration to the possibility of suing defendants for several years prior to his acquisition of Lawrence's stock, but never told Lawrence of his intention to institute litigation against Lawrence and defendants prior to the commencement of suit.

161. In connection with the transfer of his stock to Goldman in June 1956, Lawrence asked Goldman for a release, but Goldman refused, without disclosing the fact that Goldman was considering suing Lawrence or that he was conferring with Kohn for that purpose.

162. Goldman and his attorney, Harold E. Kohn, Esquire, had several meetings in 1956 prior to June 15. According to Mr. Kohn's diary, the first meeting which actually contained a notation "Re Shubert-Erlanger" was June 15, 1956.

163. Goldman and Kohn arranged and attended a meeting with Heiman and his attorney, Adolph Lund, on September 21, 1956, at the Waldorf Astoria in N.Y.C.

164. The ostensible purpose of this meeting was to obtain from Heiman a list of attractions for the coming season which UBO had been furnished by the producers of such attractions.

165. Such information was readily available in any recognized trade publication such as Variety, Celebrity Service or Show Business and Heiman was under no obligation to produce the list which he refused so to do.

166. The plaintiff's actual purpose in bringing about that meeting was to lay the groundwork for the institution of the present litigation which Kohn indicated to Lund was a possibility.

167. Following the September meeting UBO continued, as before, to book attractions into the Erlanger upon the request of any producer desiring to play the theatre.

168. LI'L ABNER was presented at the Erlanger from October 23, 1956 to November 10, 1956. LI'L ABNER was booked through UBO and UBO, prior to its cessation of business on December 29, 1956, also was active on behalf of the Erlanger in connection with other bookings.

G. ERLANGER BOOKINGS 1957–1960

169. Operators of out-of-town theatres found it advantageous in the booking of their theatres to maintain an office in New York City.

170. Prior to the spring of 1958 Goldlawr did not maintain an office or employ any booking representative in New York City for the purposes of soliciting producers to play the Erlanger. Goldman thereafter retained Alexander H. Cohen to represent him in New York City to obtain bookings for the Erlanger and New Locust theatres. Cohen was so employed between May 13, 1958 and August 26, 1960 and maintained his office in New York City.

171. During the period of his employment Cohen was quite active in his solicitation of producers and, as a result, the Erlanger obtained more attractions during the period of Cohen's employment than in any other period. Thus from the 1950–1951 to the 1957–1958, inclusive, theatrical seasons and prior to the employment of Cohen, the Erlanger had a total of 55 weeks and 5 days of attractions for an average of 6 weeks and 2 days of attractions per season. In the 1958–1959 and the 1959–1960 seasons, during the period of Cohen's employment, the Erlanger had a total of 27 weeks and 2 days of attractions for an average of 13 weeks and 5 days per season.

### H. GOLDMAN-SHUBERT THEATRE 1956–1957

172. Under the Consent Judgment in the government case, the Shuberts were required to divest themselves of the following Philadelphia theatres: Shubert and Locust or Shubert and Walnut.

173. In their negotiations with the government regarding a final Consent Judgment, the Shuberts had taken the position that they should have the right to acquire the Erlanger, if they were to give up the Locust, Walnut and Shubert Theatres in Philadelphia. The Shuberts sought the right to acquire the Erlanger Theatre only as a replacement for an existing Philadelphia operated theatre "which may be lost through physical destruction or any other cause beyond defendants' control."

174. Goldman offered $525,000 for the Shubert, Philadelphia. The theatre was sold for $565,000, 10 per cent in cash, to Flora McDonald Estates on December 7, 1957 under an agreement dated November 29, 1957. Goldman never increased his offer, nor did John, who was aware of Goldman's interest in the purchase, inquire of Goldman if he would pay more than $565,000.

175. Goldman and JJ were never on friendly terms and their relationship became particularly strained after the instant suit was filed.

176. J. J. Shubert testified emphatically that he would not sell the Shubert Theatre to Goldman on October 23, 1957, approximately a year after Goldman had caused plaintiff to commence the present litigation.

### I. ERLANGER AS A MOTION PICTURE THEATRE 1940–1950

177. The Erlanger Theatre is located at the northwest corner of 21st and Market Streets, Philadelphia, Pennsylvania. It was originally built as a motion picture theatre.

178. Between November 9, 1940 and September 15, 1950 the Erlanger was leased by The First Pennsylvania Company for Banking and Trusts to William Goldman Theatres, Inc. All of the stock of William Goldman Theatres, Inc. was owned by the same William Goldman. On September 19, 1950 the lease agreements between The First Pennsylvania Company and William Goldman Theatres, Inc. were cancelled as of September 1, 1950.

179. On December 8, 1942, William Goldman Theatres, Inc. commenced an action in the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 2877, captioned William Goldman Theatres, Inc. v. Loews, Inc., et al., against certain motion picture distributors and exhibitors, complaining that the motion picture distributors had unlawfully combined and conspired to prevent William Goldman Theatres, Inc. from obtaining first-run motion pictures for exhibition at the Erlanger Theatre.

180. On December 18, 1946 a decree was entered enjoining the defendants in William Goldman Theatres, Inc. v. Loews, Inc. et al. from engaging in the practices complained of and from licensing their feature motion pictures for first-run exhibition in Philadelphia without giving William Goldman Theatres, Inc. an opportunity to compete therefor, fixing damages in the amount of $375,000 and awarding counsel fees and costs.

181. During the pendency of the first suit against the motion picture distributors, William Goldman Theatres, Inc. commenced a second action in the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 6739, being also captioned William Goldman Theatres, Inc. v. Loews, Inc., et al. This action was settled prior to trial subsequent to Goldman's deposition on January 27, 1949.

182. In the period prior to January 27, 1949 William Goldman Theatres, Inc. always held the Erlanger available for first-run pictures and, as of January 27, 1949 William Goldman held the view that, if motion pictures were available for exhibition at the Erlanger, the Erlanger would have grossed between $35,000 and $40,000 per week, resulting in earnings of in excess of a half million dollars a year.

### J. ERLANGER AS A LEGITIMATE THEATRE 1950–1960

183. The Erlanger Theatre was not well suited for the presentation of non-musical attractions. Prior to the termination of his interest in Goldlawr, Lawrence found it "futile" to attempt to persuade producers to play dramatic attractions at the Erlanger [Lawrence NT 1389]. Prior to the commencement of the present suit, Goldman himself testified that "no producer will agree that it is a theatre for the spoken drama" [Goldman NT 2259], that "no legitimate theatre is built with 2,000 seats" and that the Erlanger was not adequate for the exhibition of legitimate attractions except "some musical comedies" [Goldman NT 2262].

184. The Shubert and Erlanger Theatres in Philadelphia were generally regarded in the theatre business as more suitable for the presentation of musical attractions; the Locust and Walnut Theatres were regarded as more suitable for the presentation of non-musical attractions [Lotito NT 2745]. The Forrest Theatre was recognized as suitable for presentation of both musical and non-musical attractions [Lotito NT 2745]; [Jacobs NT 2936–37].

185. Producers regarded the Shubert and/or Forrest as being more desirable theatres for the presentation of musicals than the Erlanger, and, therefore, preferred to present their musical attractions in the Shubert and Forrest [Samrock NT 2799; Knill NT 2894–95; Jacobs NT 2935; Merrick NT 2986–87; Fisher NT 3031–32, 3041; Langner NT 3127–28; Lotito NT 2746; Levin NT 3375–77].

186. Producers, generally, preferred the Forrest and Shubert for musicals and the Walnut, Locust and Forrest for non-musicals for the following reasons:

(a) *Location.* Producers preferred the Forrest and Shubert for musicals and the Walnut, Locust and Forrest for non-musicals, because of the unfavorable location of the Erlanger [Knill NT 2895, 2897; Jacobs NT 2944; Lotito NT 2759]. The Erlanger Theatre was not centrally located [Jacobs NT 2936; Merrick NT 2987]. Producers were of the view that the Forrest and Shubert had better locations than the Erlanger [Lotito NT 2746; Levin NT 3376]. The location of the Erlanger was extremely bad [Samrock NT 2799], in a very remote neighborhood [Langner NT 3128]; had the least desirable location of all other theatres in Philadelphia [Samrock NT 2825; Fisher NT 3032]; and there was no nearby restaurant. The Erlanger was located off the beaten path and the purchase of tickets would require either a fairly long walk from the mid-town area or a stop in an automobile or bus [Merrick NT 2987].

(b) *Size.* Many producers regarded the Erlanger Theatre as being cavernous and big in scope [Lotito NT 2760]. Producers believed that the Erlanger was big, huge and had a higher ceiling than any of the other musical comedy theatres in Philadelphia [Jacobs NT 2944]. The Erlanger was too large, in the opinion of producers, for a drama [Jacobs NT 2970–71; Susskind NT 1321; Goldman NT 2259] and was adequate only for the

exhibition of some musical comedies [Goldman NT 2262].

(c) *Intimacy.* Producers preferred other theatres in Philadelphia because the Erlanger was a less intimate theatre than the others [Knill NT 2902; Jacobs NT 2944, 2947; Fisher NT 3042; Langner NT 3128; Lotito NT 2748]. Producers were of the view that intimate, little comedies would be better in a small house [Gregory NT 1009]. The Erlanger had no degree of intimacy [Samrock NT 2800] and the Forrest [Jacobs NT 2936, 2947; Lotito NT 2759] and Shubert [Lotito NT 2764] were regarded as being more intimate.

(d) *Motion picture theatre.* Producers found the Erlanger to be undesirable for the presentation of legitimate attractions because it was built as and had the architectural characteristics of a motion picture theatre, rather than of a legitimate theatre [Lotito NT 2748]. Producers knew that the theatre was built as a motion picture theatre [Samrock NT 2800; Fisher NT 3038]. The decor, size and general appearance of the Erlanger were that of a movie theatre [Fisher NT 3042–43]. As a result, the theatre lacked the intimacy that stage attractions should have [Lotito NT 2748].

(e) *Construction.* Producers regarded the Erlanger as less desirable for the presentation of their attractions than other theatres in Philadelphia because there was construction going on in the neighborhood of the Erlanger [Lotito NT 2747; Samrock NT 2825; Knill NT 2899] and the streets were torn up [Jacobs NT 2944] during a portion of the period.

(f) *Acoustics.* The acoustical values of the Erlanger were inferior to the other theatres in Philadelphia [Samrock NT 2799, 2801].

(g) *Stage Space.* The Erlanger was less desirable from the point of view of stage space than the Forrest and Shubert [Samrock NT 2799–2800; Lotito NT 2746, 2763].

(h) *Decor and Atmosphere.* Producers did not regard the Erlanger as an attractive theatre [Jacobs NT 2944]. The Erlanger was a colder house [Fisher NT 3032]; it was not a very warm theatre and "it doesn't look very good inside" [Merrick NT 2993].

(i) *Reputation of Goldman.* William Goldman had a reputation and record of suing people frequently, a fairly constant plaintiff in law suits [Merrick NT 2988]. At least one producer preferred not to play the Erlanger because of an aversion to doing business with people who are involved frequently in law suits [Merrick NT 2988, 2997, 3023].

187. Producers regarded the Walnut, Locust and/or Forrest as being more desirable theatres for the presentation of non-musicals than the Erlanger and, therefore preferred to present their non-musical attractions in the Walnut, Locust and Forrest [Samrock NT 2801; Knill NT 2895–96; Jacobs NT 2936–37; Merrick NT 2988–89; Fisher NT 3033; Langner NT 3130; Lotito NT 2748–49; Levin NT 3377; John Shubert NT 1445].

188. The producers' preference for theatres other than the Erlanger in which to present non-musical attractions is reflected by the experience of the Locust and Erlanger Theatres, when both were under the control and management of Mr. Goldman. In the period September 1, 1958 to October 17, 1960, a total of 7 non-musical attractions were presented at the New Locust Theatre during periods of time when the Erlanger was dark. During the same period of time only one attraction was presented at the Erlanger when the New Locust was dark: BERYOZKA RUSSIAN FOLK BALLET, a musical.

189. Eleven witnesses, who had been engaged in the theatrical business during some or all of the period 1950–1960 as a theatre operator, author, producer or general manager, testified at trial and expressed their views with respect to the Erlanger [Gregory, Fisher, Jacobs, Knill, Langner, Levin, Lotito, Merrick, Samrock, Susskind, Weidman]. Although several of the witnesses regarded the Erlanger as an adequate theatre for the attractions which they presented

there, all of the witnesses who were asked testified that in their opinion other theatres in Philadelphia were more desirable and that if available they would have preferred to present their attractions in theatres other than the Erlanger.

190. In the period prior to 1957, the Erlanger Theatre was in need of repair and was not well maintained;

(a) in or about November 25, 1952, it was reported that the paint on the ceiling of the theatre "peels and falls with the slightest vibration" due to a leaking roof;

(b) in or about November 2, 1955, it was reported that the backstage area and dressing rooms were in "very bad shape" and the theatre was not in "good condition";

(c) during the fiscal year ending August 31, 1951 and through the fiscal year ending August 31, 1956, plaintiff spent a total of only $8,810.25 on the Erlanger for maintenance and repairs, an average of $1,468.37 per theatrical season.

191. By 1957, the physical condition of the Erlanger required plaintiff to make substantial expenditures. During fiscal years ending August 31, 1957, 1958 and 1959, plaintiff spent a total of $28,-794.17 for maintenance and repairs, an average of $9,598.06 per theatrical season and more than six times the annual rate of expenditure for maintenance and repairs in the period 1950–1956.

192. The conditions of disrepair of the Erlanger prior to 1957 were among the causes for the failure of the Erlanger to obtain more attractions in that period.

193. From sometime prior to April 29, 1952 to sometime after July 26, 1956, there was subway construction in and beneath Market Street in the vicinity of the Erlanger Theatre. During at least the winter and spring of 1956, there was sewer construction on Commerce Street, abutting the rear of the Erlanger Theatre. This disruptive, extensive construction in the vicinity of the Erlanger Theatre was another factor in causing producers to regard the Erlanger as less desirable than the other theatres in Philadelphia for the presentation of their attractions.

194. In the 1950–51 through 1952–53 theatrical seasons, prior to the period of construction, the Erlanger obtained a total of 169 days of attractions for an average of 8 weeks of attractions per season. During the 1953–54, 1954–55 and 1955–56 theatrical seasons, when construction was in progress in the area, the Erlanger had a total of 76 days of attractions, an average of 3 weeks and 4 days of attractions per season or less than half the seasonal average in the preconstruction period. From the 1956–57 through the 1959–1960 theatrical seasons, after completion of the construction, the Erlanger had a total of 300 days of attractions, an average of 10 weeks and 5 days of attractions per season or about three times the seasonal average during the construction period.

195. At the same time Goldman rehabilitated the theatre, and in order to enable the Erlanger, "to attract productions of such quality and in sufficient numbers to operate on a profitable basis", the officers of Goldlawr, the troublesome construction having about ended, determined in the spring of 1957 to install an air-conditioning system at the Erlanger. The Erlanger was air-conditioned in 1957 and, until the end of the damage period was the only automatically air-conditioned theatre of the five.

196. Though the Erlanger presented fewer attractions during the damage period than the Philadelphia theatres owned or controlled by the Shuberts, the difference was not caused by any acts or conduct of the defendants or those with whom they were associated, but resulted wholly from other unrelated causes.

## K. SHUBERT PHILADELPHIA THEATRES PHYSICAL CONDITION 1950–1960

197. The Shuberts, too, generally neglected their Philadelphia theatres. John admitted that the Shubert had been neglected "during our ownership."

In 1952, the insurance company sent recommendations regarding the "carpet conditions" in the Shubert-operated Philadelphia Theatres. In February 1955, JJ wrote to LSL regarding the Philadelphia theatres:

> "we have had complaints from our insurance company that our theatres are not well taken care of as far as the comfort of our patrons is concerned. * * "

198. JJ wrote LSL on June 8; 1956, regarding the dressing rooms at the Shubert as "being in very bad shape." LSL responded on June 21, 1956:

> "Yes, they are in very, very bad condition. They are mouldy, plaster is all down and they are all in deplorable shape."

199. During the damage period the Forrest did not have dressing rooms on the stage floor. They had to be reached by a tunnel under the alley between the theatre and another building.

200. However, in spite of these defects the producers and managers overwhelmingly preferred the Shubert theatres over the Erlanger primarily because of their central location, and intimacy.

L. ERLANGER BOOKING EXPERIENCE AS COMPARED WITH SHUBERT AND OTHER NON-SHUBERT THEATRES 1950–1960

201. The five relevant Philadelphia theatres had the following capacities:

| | |
|---|---|
| Forrest | 1966 |
| Shubert | 1905 |
| Erlanger | 1857 |
| Locust | 1615 |
| Walnut | 1372 |

The capacity of the Erlanger could be reduced to 1400 seats, after 1958, by a theatre-wide curtain in the midpoint of the balcony.

202. Numerous criteria enter into the producer's choice of theatre. The grossing capacity of the theatre is not controlling. [Samrock NT 2820, 2824; Knill NT 2911; Jacobs NT 2948; Merrick NT 3012]. Among those criteria which affect the producer's selection of the theatre in which to present his attraction are the following:

(a) *Location.* Producers take into consideration the location of the theatre [Levin NT 3374; Knill NT 2925]. Producers prefer a theatre which is centrally located [Jacobs NT 2936]; in the center of town [Samrock NT 2820]; where there are more patrons in the same area [Knill NT 2912].

A theatre that is a way away from all the others is less desirable [Langner NT 3129]; and a theatre is much more attractive when more people are able to pass the theatre [Lotito NT 2759]; producers prefer a theatre located near other theatres and business districts [Levin NT 3373]; near the office buildings so that patrons can more easily acquire tickets [Merrick NT 2997].

(b) *Intimacy.* Producers prefer a theatre which promotes an intimacy on the part of the audience in relation to the attraction on the stage [Samrock NT 2921]. Intimacy is a matter of the architecture of the theatre [Samrock NT 2820], which is not dependent upon the number of seats contained in the theatre [Langner NT 3128–29]. Some theatres look intimate but seat a large number of people [Langner NT 3148].

Intimacy is a quality which is "impossible to define." Intimacy is a "feeling" which "comes from experience in the theatrical business, of knowing a large, overlarge theatre as against an intimate theatre." [Jacobs NT 2948].

The quality of intimacy is more important in selecting a theatre in which to present a drama than for a musical [Knill NT 2926], although producers of musicals also regard intimacy as an important factor [Fisher NT 3031–32].

(c) *Others.* Other criteria include: acoustics [Samrock NT 2820]; stage room [Levin NT 3373]; reputation of the theatre for presenting successful attractions [Langner NT 3147]; the state of repair of the theatre [Levin NT 3373]; aesthetics [Merrick NT 2989; 3012]; booking terms [Jacobs NT 2958, 2968].

203.   Producers of legitimate attractions have preferences as to the theatres in which they desire to present their attractions [Small NT 955–56].   Producers believe that all theatres are not equally desirable and that "every theatre is different" [Langner NT 3151].   Sometimes superstition enters into the producer's choice of theatres [Small NT 950].   Thus Mr. Jerome Weidman regarded the Erlanger with favor because "I had had luck there" with FIORELLO [Weidman NT 875].   On the other had Mr. David Susskind preferred not to play the Locust Theatre in Philadelphia because "It is a bad luck theatre for me.   I am getting superstitious."   [Susskind NT 1302–03].

204.   Generally, however, in choosing between available theatres, producers try to pick out the most desirable theatre [Lotito NT 2787] and try to get the best theatre in a town [Langner NT 3147]. The producers try to secure a theatre which will give the best performance and which will retain the quality of performance of the attraction [Samrock NT 2824;  Jacobs NT 2945];  they attempt to get a theatre which fits the attraction best [Jacobs NT 2937;   Merrick NT 3012–13].

205.   The producers' principal concern is the satisfaction of the audience and they select a theatre in an endeavor to get the play across to the audience best [Jacobs NT 2949;  Langner NT 3148]. The producer also attempts to obtain a theatre that most closely approximates the theatre the producer will play in New York City, so that the actors get the experience of projecting themselves effectively to the audience, and so that the production looks good in the proscenium arch [Fisher NT 3048;  John Shubert NT 1445].

206.   Between September 1, 1950 and October 17, 1960, 30 attractions were presented in the Erlanger Theatre in Philadelphia.  Of these, 19 were also presented in a theatre in New York City, 10 (or 52.63%), of which were presented in a Shubert theatre in New York.   This is virtually identical with the percentage of other attractions which played other non-Shubert out-of-town theatres and which played Shubert-New York (52.10%). There was no exclusion, between September 1, 1950 and October 17, 1960, from Shubert-New York theatres of attractions which played non-Shubert theatres elsewhere.

207.   Between September 1, 1950 and October 17, 1960, 180 attractions were presented in all non-Shubert operated theatres in Philadelphia and Washington (excluding the Erlanger).  Of these, 119 were also presented in a theatre in New York City, 62 (or 52.10%) of which were presented in a Shubert theatre in New York.

208.   The experience of the Erlanger with respect to the movement of attractions to and from Shubert New York theatres was almost identical with the experience of other out-of-town non-Shubert theatres in Washington and Philadelphia.

209.   Operators of non-Shubert New York theatres, in the period between September 1, 1950 and October 17, 1960, had "just as many" bookings per theatre as did Shubert New York theatres and had "no trouble getting attractions" for presentation at their theatres.   Many so-called "hit" shows were presented in non-Shubert New York theatres.   Shows presented in non-Shubert New York theatres were often those which had tried out in Shubert theatres out-of-town.  Operators of out-of-town non-Shubert theatres were not prevented from obtaining bookings for road-shows because the show had had a run in a Shubert New York theatre.

210.   No producer of any legitimate attraction was prevented by any conduct of defendants from presenting any legitimate attraction at the Erlanger Theatre between September 1, 1950 and October 17, 1960.

211.   Those producers desiring to book their attractions at the Erlanger did, in fact, do so.

212.   Producers who presented their attractions at the Erlanger Theatre were not penalized or discriminated against in

any way by the Shuberts or by UBO for having played their attractions at the Erlanger.

213. No attraction, in addition to those in fact presented at the Erlanger Theatre, would have been presented at the Erlanger in the period September 1, 1950 through October 17, 1960 in a market unrestrained by defendants alleged violations of the antitrust laws.

214. The Shubert Theatre in Philadelphia was operated by the Shuberts between September 1, 1950 and December 9, 1957. In the period September 1, 1950 through August 31, 1957, when it was Shubert-operated, attractions were booked into the Shubert Theatre which earned 32.43% of the total Philadelphia house share earned by all five Philadelphia theatres during the same period.

215. Between December 9, 1957 and October 17, 1960, the Shubert Theatre was operated by William McKnight, through his manager Samuel Schwartz. This operation was slightly more successful than that of the Shuberts. During the period September 1, 1958 through October 17, 1960, attractions were booked into the Shubert which earned 32.93% of the total house share earned by all five Philadelphia theatres during the same period, an increase of 1.54% over the percentage of the house share earned by the theatre when Shubert-operated.

216. The Locust Theatre in Philadelphia was operated by the Shuberts from September 1, 1950 through the end of the 1956–57 theatrical season. During the period September 1, 1950 through August 31, 1957 the Shuberts booked attractions into the Locust which earned 13.37% of the total house share earned by all five Philadelphia theatres during the same period.

217. During the 1957–58 theatrical season, the Locust Theatre was operated by Manny Davis, who was more successful in his operation of the Locust than were the Shuberts. During the 1957–58 theatrical season, Davis booked attractions into the Locust which earned 14.-67% of the total house share earned by all five Philadelphia theatres during the same period, an increase of almost 10% over the percentage of house share (13.-37%) earned by the Locust when it was Shubert-operated.

218. From September 1, 1958 through October 17, 1960, the Locust Theatre was operated by William Goldman Theatres, Inc. which was also more successful in its operation of the Locust than were the Shuberts. During the period September 1, 1958 through October 17, 1960, William Goldman Theatres, Inc. booked attractions into the Locust which earned 14.-59% of the total house share earned by all five Philadelphia theatres during the same period, an increase of 9.12% over the percentage of house share earned by the Locust when it was Shubert-operated.

219. Plaintiff was not injured in its business or property by reason of any monopoly or attempt to monopolize by defendants or by reason of any conspiracy by defendants to monopolize or to restrain.

220. Plaintiff did not sustain any damages by reason of any conduct or activities of defendants.

## IX. DISCUSSION

As may be readily perceived from the foregoing findings of fact we have concluded that, although defendants did in fact engage in unlawful restraint of trade and monopolization of the legitimate theatre business during the period 1933–1949, such violations did not continue after 1950. It may fairly be inferred, we think, that the cessation resulted from defendants' awareness, after 1946, of the government's investigation, which culminated in the government's suit in February 1950. There was an utter lack of any persuasive, credible evidence to support the plaintiff's contentions that the illegality continued during the damage period.

The defendants, on the other hand, convincingly established that, during the damage period, producers, managers and theatre operators were able to compete freely for attractions and did in fact pre-

sent them without restraint by the defendants.

We do not agree with the plaintiff that from the earlier existence of a conspiracy and of antitrust violations, which prevailed before Goldlawr came into being, a presumption arises that such activities continued after Goldlawr entered the legitimate theatre business. "The plaintiff had the burden of proving that the conspiracy * * * did continue." Webster Rosewood Corp. v. Schine Chain Theatres, Inc., 263 F.2d 533, 535 (2 Cir. 1959) cert. denied 360 U.S. 912, 79 S.Ct. 1296, 3 L.Ed.2d 1261 (1959).

Goldlawr failed to sustain this burden, while the defendants did demonstrate to our satisfaction by credible evidence that they did not continue their pre-1950 monopolistic control of the legitimate theatre business during the damage period.

Accordingly, we reach the following

## X. CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject-matter under the relevant provisions of the Sherman Act.

2. The booking of legitimate theatre productions was, during the relevant period, trade or commerce among the several states within the meaning of the relevant statutory provisions.

3. The presentation of legitimate theatre productions was, during the relevant period, trade or commerce among the several states within the meaning of the relevant statutory provisions.

4. From, at least, 1933 until 1949, the defendants continuously conspired among themselves, and with others, unreasonably to restrain and attempted to and did substantially restrain interstate trade and commerce in the booking of legitimate theatre productions throughout the United States outside New York City in violation of the Sherman Act.

5. From, at least, 1933 until 1949, defendants continuously conspired among themselves, and with others, to monopolize and attempted to and did substantially monopolize interstate trade and commerce in the booking of legitimate theatre productions throughout the United States outside New York City in violation of the Sherman Act.

6. From, at least, 1933 until 1949, defendants continuously conspired among themselves, and with others, unreasonably to restrain and attempted to and did substantially restrain interstate trade and commerce in the presentation of legitimate theatre productions throughout the United States in violation of the Sherman Act.

7. The unlawful objects of the defendants' conspiracy and attempts to restrain and monopolize were:

(a) to compel producers who, sought to book outside New York City, to book exclusively through one or more of defendants or through UBO,

(b) to exclude others from booking productions for presentation outside New York City,

(c) to restrain competition in the presentation of productions outside New York City,

(d) to combine the power of defendants and that of non-defendant conspirators in the booking and presentation of productions in order to maintain and strengthen this domination in each of these fields.

8. At all times during the period 1950–1960 for which plaintiff has claimed damages plaintiff had business and property entitled to the protection of the federal antitrust laws.

9. Plaintiff's claims are not barred under the doctrine of "in pari delicto". Perma Life Mufflers, Inc. et al. v. International Parts Corp. et al., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).

10. There is no credible evidence which establishes that the aforesaid antitrust violations, committed by the defendants during the period 1933–1949, continued during the damage period 1950–1960, after the plaintiff came into existence.

11. There is substantial credible evidence that, during the damage period 1950–1960, the earlier unlawful conduct of the defendants did not continue.

12. Plaintiff was not injured in its business or property, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15, by any monopoly, attempts to restrain or monopolize or conspiracy to restrain or monopolize on the part of defendants or any of them.

13. Plaintiff is not entitled to recover damages, to obtain injunctive relief or to an award of attorneys' fees and costs.

In view of the factual findings and the foregoing legal conclusions we deem it unnecessary to resolve certain of the issues, Nos. 8, 11, 12, 13 and 14, delineated in our final pre-trial order of September 15, 1967.

### ORDER

Now, this 20th day of September, 1968, it is accordingly ordered that judgment be, and it is, entered in each action in favor of defendants and against plaintiff, Goldlawr, Inc.